IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

IN RE: :
MANN REALTY ASSOCIATES, INC. : CASE NO. 1-17-00080-RNO
    Debtor :
: CHAPTER 11
DOUBLE M REAL ESTATE, LLC and :
MARTIN L. GRASS AND :
MARK G. CALDWELL, TRADING AS :
DOUBLE M DEVELOPMENT, :
    Movants :
:
v. :
:
MANN REALTY ASSOCIATES, INC. :
    Respondent :

DEBTOR'S RESPONSE TO MOTION OF
DOUBLE M REAL ESTATE, LLC AND DOUBLE M DEVELOPMENT
FOR RELIEF FROM THE AUTOMATIC STAY
PURSUANT TO 11 U.S.C. SECTION 362(d)

AND NOW, comes Debtor, Mann Realty Associates, Inc., and respectfully responds as follows:

1. Admitted in part, denied in part. Debtor has no knowledge. Strict proof is demanded.

2. Admitted in part, denied in part. Debtor has no knowledge. Strict proof is demanded.

3. Admitted.

4. Admitted.

5. Admitted.

6. Admitted in part, denied in part. The Deed speaks for itself.

7. Admitted.

8. Admitted in part, denied in part. The Agreement of Sale speaks for itself. Strict proof is demanded. The Agreement is subject to the Deed of Easement and Declaration of Restrictive Covenants attached as Exhibit "A".

9. Admitted in part, denied in part. Susan Mumma is the Trustee of the Robert M. Mumma II Grantor Retained Annuity Trust (hereinafter the "GRAT") and Robert M. Mumma is the Grantor Trustee. Debtor has owned subject real estate since 2000. It is specifically denied that the Transfer of the real estate was unlawful. Same was disclosed to Judge Clark in the State Court proceedings. However, Debtor was never made a party to that litigation, so no Court has ruled on Debtor's rights vis a vie the issues raised in the Motion for Relief. It is specifically denied that the principals of the Debtor and of the GRAT are the same individuals. Debtor is owned by Robert Mumma II, Susan R. Mumma (his wife), Susan Coppola and Marguerite M. Mumma (the latter two are the daughters of Robert M. Mumma and Susan R. Mumma). Robert M. Mumma and Susan R. Mumma collectively own 75% of the Debtor, Susan Coppola owns approximately 13% of the Debtor and Marguerite M. Mumma owns approximately 12% of the Debtor. Susan Coppola and Marguerite Mumma are the beneficiaries of the trust. Further, it is believed the trust has expired by its own terms in August of 2008.

10. Admitted in part, denied in part. The Order speaks for itself.

11. Admitted in part, denied in part. The Court Order speaks for itself. Whether the Sanctions Judgment is a lien and the priority of same is a conclusion of law, to which no response is required. Strict proof is demanded.

12. Admitted in part, denied in part. Strict proof is demanded as to the calculation of the Sanctions Judgment and interest.

13. Admitted in part, denied in part. Debtor has no knowledge. Strict proof is

demanded. Debtor believes and hereby avers that documents evidencing the transfer of the mortgage to Double M LLC were recorded after the filing of the present bankruptcy, and therefore the recording of same may have been in violation of the automatic stay. Further, Debtor believes and hereby avers that the principal and interest amount presently due on said mortgage is approximately $980,000.00.

14. Admitted in part, denied in part. Strict proof is demanded.

15. Admitted in part, denied in part. The allegations of paragraph 15 call for a conclusion of law. No response is required. Strict proof is demanded.

16. Admitted. Further, Debtor believes and hereby avers that the Sheriff's sale was stayed by an Order issued by Judge Clark of the Court of Common Pleas of Dauphin County. Further, Debtor believes and hereby avers that after the filing of the bankruptcy, Judge Clark removed his stay on the sale, which again may have been a violation of the automatic stay.

17. Admitted in part, denied in part. Debtor has no knowledge. Strict proof is demanded.

18. Denied. Debtor believes and hereby avers that the fair market value of the real estate is approximately $14,500,000.00.

19. Denied. See response to paragraph 18.

20. Denied. A portion of the real estate in question is a quarry, which would generate considerable income once remediation is completed by the former tenant. Further, Debtor has plans to build a warehouse on the property of up to 500,000 square feet, which would generate significant additional income for Debtor and increase the value of subject property.

21. Admitted in part, denied in part. The allegations of this paragraph call for a conclusion of law. Strict proof is demanded. The legal description as to the Option Real Estate is

in dispute. The description of the Option Real Estate as alleged by the Movant is pursuant to the plan drawn up and testified to by Doug Gosick (sp?) in the Dauphin County litigation (hereinafter "Gosick Description") is further north than the description contained in the Agreement of Sale and Addendum thereto (hereinafter "Agreement Description"). Further, Debtor denies that it has the obligation to transfer the Option Real Estate to Movant since the option was not exercised in a timely manner, the subdivision of same was not completed within the option period and that Movants' proceeded in bad faith.

22. Denied. See responses to paragraphs 18, 19 and 20.

23. Admitted in part, denied in part.

a) The option to purchase the real estate was not transferred since the description of the property as alleged by Double M Partnership was different than the description than the description of the property as contained in the Sales Agreement.

b) The option to purchase the real estate expired on March 5, 1998. On January 1, 2000, a 143 acre tract, including the Option Real Estate, was transferred from the GRAT to Robert Mumma II, grantor Trustee, and Susan R. Mumma, Trustee, pursuant to the provisions of the Trust Agreement. Thereafter, the grantor Trustee and Trustee transferred the property to the Debtor in exchange for stock. Said transfers occurred for estate planning purposes.

c) Admitted in part, denied in part. It is admitted that the Option Real Estate was not reconveyed from the Debtor to the GRAT. However, the Option Real Estate could not be reconveyed from the Debtor to the GRAT since Movant never had the Option Real Estate subdivided.

d) Admitted in part, denied in part. It is admitted that the sanctions were never paid. Debtor believes the sanctions should not have been imposed since Debtor

could not transfer the Option Real Estate with the Gosick description since same would have violated the Deed of Easement and Declaration of Restrictive Covenants attached hereto as Exhibit "A".

24. Denied. This bankruptcy was not filed as a delaying tactic. Debtor has a reasonable prospect of reorganization. The value of Debtor's assets greatly exceed the debts of the Debtor.

25. Denied. Movant's interest is adequately protected by a significant equity cushion.

26. Denied. It is denied that Movant is entitled to relief from the automatic stay. See responses to paragraphs 18 through 20 and 25 above.

27. Denied. There is no reason why Rule 4001(a)(3) should not apply.

28. Admitted. However, Debtor is entitled to reorganize and has a reasonable prospect for reorganization.

**WHEREFORE**, Debtor respectfully requests that this Honorable Court issue an Order denying the Motion for Relief From Stay.

Respectfully submitted,

By: Robert M. Mann II, President
Mann Realty Associates, Inc.

DATED: Feb 10, 2017

## DEED OF EASEMENT
## AND
## DECLARATION OF RESTRICTIVE COVENANTS

THIS DEED OF EASEMENT AND DECLARATION OF RESTRICTIVE COVENANTS ("Deed and Declaration") made as of the 15 day of August, 1995 by ROBERT M. MUMMA, II and SUSAN MUMMA, TRUSTEES OF THE ROBERT M. MUMMA, II, GRANTOR RETAINED ANNUITY TRUST (the "Owner") and PENNSY SUPPLY, INC., a Pennsylvania corporation ("Tenant");

### WITNESSETH:

WHEREAS, Owner is the owner of the real property situated in Lower Swatara Township, Dauphin County, Pennsylvania, more specifically described on Exhibit "A" hereto and depicted on Exhibit "B" hereto (the "Property"); and

WHEREAS, Owner has leased the Property to Tenant pursuant to a certain Quarry Lease of even date herewith (the "Lease"), a memorandum of which is to be recorded contemporaneously herewith in the land records of Dauphin County, Pennsylvania; and

WHEREAS, Owner has entered into an Agreement of Sale dated March 6, 1995 with Double M. Development Co., a partnership consisting of Martin L. Grass and Mark G. Caldwell ("Buyer"), which Agreement of Sale, as amended to the date hereof (the "Sale Agreement"), provides for (a) the sale by Owner to Buyer of that portion of the Property shown on Exhibit "B" as "Proposed Lot #1" containing 34.2793 acres ("Lot #1") and (b) an option in favor of Buyer to purchase additional portions of the Property adjacent to Lot #1 and located directly to the east of Lot #1, between Lot #1 and the eastern boundary of the Property and south of the line that would be created by extending the northernmost boundary of Lot #1 to the eastern boundary of the Property (the "Option Property"); and

WHEREAS, on and subject to the terms of the Lease, Owner has the right to subdivide the Property into separate legal lots along the lines (the "Subdivision Lines") approximately set forth on Exhibit "B" hereto or, with respect to the Option Property, described in the preceding recital, whereupon, as provided in the Lease, the Lease shall automatically terminate with respect to the lot or lots to the south of whichever of such Subdivision Lines is, from time to time, the northernmost division of the Property and such lot or lots shall no longer be subject to the Lease, so that the premises demised by the Lease shall consist solely of the

COZ008589

"A"

legal lot to the north of the northernmost division of the
Property made pursuant to the Lease. (The portion of the
Property that is no longer subject to the Lease after each
subdivision effected pursuant to the Lease is hereinafter
referred to as the "Excluded Property" and the portion of the
Property that remains subject to the Lease after each
subdivision is hereinafter referred to as the "Post-
Subdivision Premises".) In no event, however, shall the
Property be subdivided by Owner during the term of the Lease
along a line more northerly than the northernmost Subdivision
Line set forth on Exhibit "B" hereto; and

WHEREAS, the first subdivision of the Property to be
effectuated is to separate Lot #1 from the Property; and

WHEREAS, as a condition to Tenant's entering into
the Lease, Owner has agreed to execute and deliver this Deed
and Declaration in order to provide for continuing access to
the Post-Subdivision Premises across a portion of the Excluded
Property and to regulate the use and development of the
Excluded Property so as to preserve and protect Tenant's
rights under the Lease with respect to the Post-Subdivision
Premises;

NOW, THEREFORE, for good and valuable consideration,
the receipt and sufficiency of which are hereby acknowledged,
Owner and Tenant hereby agree as follows:

1. Easement for Access.

a. Owner hereby grants and conveys to, and
creates in favor of Tenant, for so long as the Lease shall
remain in effect, an easement across the Excluded Property for
the use and maintenance of a roadway providing access to the
Post-Subdivision Premises. Subject to Owner's right to
relocate the easement pursuant to Section 1(c) below, such
easement shall be located along and over the road that
currently exists on the Property, as approximately shown on
Exhibit "B" hereto. For so long as the Lease remains in force
and effect, Tenant and Tenant's officers, employees, agents,
contractors, representatives, customers, guests, invitees, and
others desiring or requiring access to the Post-Subdivision
Premises shall at all times have the free and unfettered right
to use the roadway easement granted hereby for ingress to and
egress from the Post-Subdivision Premises.

b. The easement created by Section 1(a) above
shall include the right, at Tenant's expense, to maintain and,
if Tenant so desires, improve the roadway across the Excluded
Property, together with the shoulders, drainage, and lateral
support along such roadway, and to go upon the Excluded
Property as may reasonably be necessary for such purposes. In

2     COZ008590

Case 1:17-bk-00080-RNO    Doc 12    Filed 02/10/17    Entered 02/10/17 15:43:07    Desc
Main Document    Page 7 of 16

maintaining the roadway across the Excluded Property, Tenant shall use commercially reasonable efforts to minimize any disruption of Owner's activities on the Excluded Property. If Tenant elects to improve the roadway, Tenant shall (i) at all times during its work carry or cause its general contractor to carry insurance against loss or liability arising out of such work providing protection of not less than a combined single limit of $1,000,000 per occurrence and umbrella coverage of not less than $2,000,000 and naming Owner as an additional insured; (ii) comply with all laws, rules, regulations, codes and ordinances applicable to such work; (iii) not create or permit to be created any mechanic's or materialman's lien against the Excluded Property; (iv) use commercially reasonable efforts to minimize any disruption of Owner's activities on the Excluded Property; and (v) protect, defend, indemnify and hold Owner harmless against any and all loss or liability arising out of such work.

c. On not less than ninety (90) days' prior written notice to Tenant, Owner shall have the right to construct an alternative roadway across the Excluded Property to provide access to the Post-Subdivision Premises, provided that (i) the course, grade, width, surfacing, cost to maintain, and other characteristics of the alternative roadway shall have been approved by Tenant in writing, such approval not to be unreasonably withheld or delayed; (ii) the existing roadway shall remain open and freely usable at all times until the alternative roadway is complete and freely usable at all times; (iii) Tenant shall have received all permits, approvals, and consents from governmental authorities that may be required so that Tenant may use such alternative roadway in the ordinary course of Tenant's business; (iv) the planning and construction of the alternative roadway shall be at Owner's sole cost and expense; (v) the alternative roadway shall provide Tenant with access to the Post-Subdivision Premises in all material respects comparable to the access provided by the existing roadway; and (vi) the alternative roadway shall comply with all applicable laws, rules, regulations, codes, and ordinances. If the construction of an alternative roadway reasonably requires that Tenant make alterations to the Post-Subdivision Premises or any improvements thereon or if the cost of maintaining the alternative roadway is materially greater than the cost of maintaining the existing roadway, Owner shall pay on demand the reasonable costs incurred by Tenant in making all such alterations and all increases in maintenance costs incurred by Tenant. If Owner constructs an alternative roadway to provide access to the Post-Subdivision Premises in accordance with this Section 1(c), the easement created by Section 1(a) above shall be deemed to be relocated to such roadway when the alternative roadway is complete and freely usable at all times and Tenant shall have received all permits, approvals, and

COZ008591

3

consents from governmental authorities that may be required so
that Tenant may use such alternative roadway in the ordinary
course of Tenant's business.

        d.    If Owner's activities on or development of
the Excluded Premises necessitate improvements or alterations
to or in connection with the roadway providing Tenant with
access to the Post-Subdivision Premises, Owner shall make all
such improvements and alterations at Owner's sole cost and
expense.

        e.    The easement and rights created under this
Section 1 shall not apply to, affect or burden Lot #1 or the
Option Property and Owner shall have no right to relocate the
easement to Lot #1 or the Option Property.

    2.    Restrictive Covenants.

        a.    For so long as the Lease shall remain in
effect, Owner shall not construct or permit the construction
of, or dedicate any of the Property for, any dwelling, house,
building, utility, roadway, drainage or water management
system, public amenity or other improvement, or take or permit
any other action on the Excluded Property which could result
in a limitation or other adverse effect on Tenant's absolute
and unconditional right (subject to the terms of the Lease and
Tenant's permits) to conduct Tenant's surface mining and stone
processing operations in the normal course of its business to
the fullest extent and as close to the boundaries of the Post-
Subdivision Premises as would be permitted under the Lease,
Tenant's permits, and applicable laws, rules, regulations,
codes, and ordinances in the absence of such construction,
dedication or other action. Without limiting the generality
of the preceding sentence, Owner shall not construct or permit
the construction of (i) any gas, oil or other pipeline within
two hundred feet (200') of the limit of mining on the north
side of the unnamed tributary to Swatara Creek that crosses
the Property in a generally east-west direction, as such limit
(the "Limit of Mining") is set forth in Tenant's existing
surface mining permit; (ii) any dwelling, school, or other
occupied residential, commercial, industrial, public or other
building or any park within three hundred feet (300') of the
Limit of Mining; or (iii) any public way within eight hundred
feet (800') of the Limit of Mining. Owner, at its sole cost
and expense, shall promptly remove any improvement constructed
and remedy any other action taken in violation of the
foregoing prohibition. Owner shall not be deemed to have
permitted an action in violation of this Section 2(a) where a
utility, roadway, school or other public amenity is
constructed by a governmental authority on a portion of the
Property taken by such governmental authority under power of
eminent domain and not at the instigation of Owner. The

covenants and limitations set forth in this Section 2(a) shall not apply to Lot #1 or, upon the subdivision of the Option Property from the remainder of the Post-Subdivision Premises and the conveyance of title thereto to Buyer or Buyer's successor or assignee under the Sale Agreement, the Option Property.

    b. For so long as (i) the Lease shall remain in effect and (ii) Tenant's obligations thereunder shall continue to be guaranteed by Oldcastle, Inc., no portion of the Excluded Property (including Lot #1 and the Option Property) shall be used in connection with the stone (including any type of crushed stone, aggregate, manufactured sand or manufactured gravel) quarrying, crushing, production or supply business, asphalt production or supply business, concrete production or supply business, or asphalt paving business. Owner hereby acknowledges and agrees that in the event of any breach or threatened breach of this Section 2(b), Tenant may have no adequate remedy at law and may suffer substantial and irreparable damage. Accordingly, Tenant may, in its sole discretion, seek to obtain injunctive relief and/or recover monetary damages in connection with any such breach or threatened breach. Nothing in this Section 2(b) shall limit or restrict Buyer in any form or degree from using Lot #1 or the Option Property after Buyer's acquisition thereof for the storage, packaging or distribution of any product or commodity by Buyer or Buyer's tenants, successors or assigns other than in connection with any of the businesses identified in the first sentence of this Section 2(b).

    3. <u>Consent to Tenant's Operations</u>. Owner hereby consents to the conduct of surface mining and stone processing operations on the Post-Subdivision Premises as close to the boundaries of the Post-Subdivision Premises as would be permitted by the Lease, Tenant's permits, and applicable laws, ordinances, regulations, rules, and codes. At Tenant's request, Owner shall execute and deliver, in form suitable for recordation or filing with the appropriate governmental offices, such additional documents and forms as may be required by law or as Tenant may reasonably request to further evidence and effectuate the consent set forth in this Section 3.

    4. <u>Amendments</u>. This Deed and Declaration may not be amended, modified or supplemented, except in a writing recorded in the land records of Dauphin County, Pennsylvania.

    5. <u>Enforceability</u>. This Deed and Declaration shall run with the land and shall be binding upon the parties hereto and their respective heirs, successors, executors, personal representatives and assigns and shall inure to the benefit of the parties hereto and their respective heirs,

successors, executors, personal representative and assigns. Tenant shall have all rights and remedies available at law and in equity by reason of a breach of this Deed and Declaration, including, without limitation, the right of specific performance.

      6. <u>Construction</u>. This Deed and Declaration shall be carried out, governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania.

      7. <u>Severability</u>. If any provision of this Deed and Declaration shall be held or deed to be or shall, in fact, be inoperative or unenforceable as applied in any particular case in any jurisdiction or jurisdictions or in all jurisdictions, or in all cases because it conflicts with any other provision or provisions hereof or any constitution or statute or rule of public policy, or for any other reason, such circumstances shall not have the effect of rendering the provision in question inoperative of unenforceable in any other cases or circumstance or of rendering any other provision or provisions herein contained invalid, inoperative or unenforceable to any extent whatsoever.

      8. <u>Further Assurances</u>. Each of Owner and Tenant shall do such further acts and things and execute and deliver such additional agreements and instruments as the other may reasonably require in order to effectuate, evidence or confirm any right, restriction, obligation, or agreement contained herein or to better realize the intent hereof.

      9. <u>Termination</u>. This Deed and Declaration shall terminate and be of no further force or effect upon the expiration or earlier termination of the Lease. Following the expiration or earlier termination of the Lease, if Owner shall prepare and present to Tenant an instrument terminating this Deed and Declaration in form reasonably satisfactory to Tenant, Tenant shall promptly execute and deliver such instrument to Owner.

      10. <u>Arbitration</u>. All disputes at law or in equity arising under, as a result of or in any way in connection with this Deed and Declaration and to which the Owner named in the preamble hereto or any successor that is controlled by Robert M. Mumma, II may be a party shall be resolved only by arbitration in accordance with Article 21 of the Lease.

6

COZ008594

IN WITNESS WHEREOF, the undersigned have executed this Deed of Easement and Declaration of Restrictive Covenants as of the date first set forth above.

**OWNER**

ROBERT M. MUMMA, II and SUSAN MUMMA, TRUSTEES OF THE ROBERT M. MUMMA, II, GRANTOR RETAINED ANNUITY TRUST

By: _/s/ Robert M. Mumma, II_
Robert M. Mumma, II
Trustee

By: _/s/ Susan Mumma_
Susan Mumma
Trustee

**TENANT**

PENNSY SUPPLY, INC.,
a Pennsylvania corporation

By: _/s/ Glenn A. Culpepper_
Name: Glenn A. Culpepper
Title: Asst. Secretary

COZ008595

STATE OF  District of Columbia :
                                  : SS.
COUNTY OF _____ :

     On this __14th__ day of August, 1995, before me a Notary Public in and for the jurisdiction aforesaid, personally appeared ROBERT M. MUMMA, II, and SUSAN MUMMA, who, known to me (or satisfactorily proven) to be the persons whose names are subscribed to the foregoing instrument, and acknowledged that they executed the same for the purposes therein contained as their own free act and deed as trustees of the Robert M. Mumma, II, Grantor Retained Annuity Trust.

     IN WITNESS WHEREOF, I hereunto set my hand and official seal.

*Judith Feldman*
Notary Public
My Commission Expires:

Judith T. Feldman
Notary Public, District of Columbia
My Commission Expires April 30, 1997

STATE OF __Washington__ :
                          : SS.
COUNTY OF __District of Col.__ :

     On this __15__ day of August, 1995, before me, the undersigned, personally appeared _____, who acknowledged himself to be the _____ of Penney Supply, Inc., and that he, as such officer, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation as such officer.

     IN WITNESS WHEREOF, I hereunto set my hand and official seal.

Notary Public
My Commission Expires:
July 31, 1999

WA951870.090/13

COZ008596

8

Case 1:17-bk-00080-RNO   Doc 12   Filed 02/10/17   Entered 02/10/17 15:43:07   Desc
Main Document    Page 13 of 16

EXHIBIT A

ALL THAT CERTAIN piece, parcel or lot of land situate, lying and being in Lower Swatara Township, Dauphin County, Pennsylvania, bounded and described as follows to wit:

BEGINNING at a railroad spike in the centerline of North Union Street (T-390), said point being a northwesterly corner of lands now or formerly of Kalstone Corporation and the southwesterly corner of the hereinafter described tract of land and running; thence along the centerline of the said North Union Street (T-390), North 00 degrees 08 minutes 34 seconds West, a distance of 591.09 feet to a nail; thence along the same, North 00 degrees 21 minutes 04 seconds West a distance of 144.78 feet to a point; thence along the same, on a curve to the right having a radius of 836.29 feet an arc distance of 301.73 feet, said curve having a chord of North 09 degrees 59 minutes 12 seconds East a distance of 300.15 feet; thence along the same, North 20 degrees 19 minutes 29 seconds East a distance of 670.45 feet to a point; thence along the same, on a curve to the right having a radius of 730.66 feet an arc distance of 205.71 feet, said curve having a chord of North 28 degrees 23 minutes 25 seconds East a distance of 205.03 feet; thence along the same, North 36 degrees 27 minutes 22 seconds East a distance of 107.71 feet to a point; thence along the same, on a curve to the left having a radius of 555.92 feet an arc distance of 141.00 feet, said curve having a chord of North 29 degrees 11 minutes 26 seconds East a distance of 140.62 feet; thence along the same, North 21 degrees 55 minutes 29 seconds East a distance of 187.28 feet to a point; thence along the same, on a curve to the left having a radius of 491.06 feet an arc distance of 182.48 feet, said curve having a chord of North 11 degrees 16 minutes 45 seconds East, a distance of 181.43 feet; thence along the same, North 00 degrees 38

minutes 00 seconds East a distance of 497.22 feet to a nail in the intersection of said North Union Street (T-390) and Long View Drive (T-355); thence leaving said roads and running; South 74 degrees 18 minutes 25 seconds East a distance of 233.34 feet to a Limestone; thence, North 16 degrees 50 minutes 57 seconds East a distance of 864.00 feet to a Limestone; thence, South 73 degrees 07 minutes 39 seconds East a distance of 1,394.03 feet to a point on the westerly edge of Swatara Creek; thence along the westerly edge of Swatara Creek, South 14 degrees 31 minutes 26 seconds West a distance of 115.16 feet to a point; thence along the same, South 07 degrees 05 minutes 29 seconds West a distance of 100.40 feet to a point; thence along the same, South 14 degrees 14 minutes 18 seconds West a distance of 100.06 feet to a point; thence along the same, South 10 degrees 45 minutes 40 seconds West a distance of 124.43 feet to a point; thence along the same, South 06 degrees 00 minutes 48 seconds West a distance of 100.02 feet to a point; thence along the same, South 02 degrees 01 minutes 00 seconds West a distance of 100.40 feet to a point; thence along the same, South 07 degrees 09 minutes 31 seconds West a distance of 100.00 feet to a point; thence along the same, South 07 degrees 57 minutes 00 seconds East a distance of 103.58 feet to a point; thence along the same, South 03 degrees 34 minutes 12 seconds West a distance of 96.04 feet to a point; thence along the same, South 08 degrees 22 minutes 39 seconds West a distance of 100.72 feet to a point; thence along the same, South 02 degrees 03 minutes 56 seconds East a distance of 110.82 feet to a point; thence along the same, South 04 degrees 21 minutes 09 seconds East a distance of 100.00 feet to a point; thence along the same, South 06 degrees 04 minutes 16 seconds East a distance of 100.05 feet to a point; thence along the same, South 13 degrees 26 minutes 36 seconds East a distance of 101.27

COZ008597

EXHIBIT A

feet to a point; thence along the same, South 10 degrees 37 minutes 48 seconds East a distance of 100.60 feet to a point; thence along the same, South 28 degrees 55 minutes 46 seconds East a distance of 220.83 feet to a point; thence along the same, South 04 degrees 13 minutes 45 seconds East a distance of 355.55 feet to a point; thence along the same, South 12 degrees 02 minutes 28 seconds East a distance of 199.80 feet to a point; thence along the same, South 14 degrees 02 minutes 44 seconds East, a distance of 200.09 feet to a point; thence along the same, South 13 degrees 26 minutes 52 seconds East a distance of 144.39 feet to a point; thence along lands now or formerly of Kalstone Corporation, South 85 degrees 19 minutes 43 seconds West, a distance of 281.08 feet to a point; thence along the same, South 86 degrees 18 minutes 05 seconds West a distance of 479.52 feet to a copper-steel rod; thence along the same, South 87 degrees 37 minutes 07 seconds West a distance of 259.55 feet to a copper-steel rod; thence along the same, South 86 degrees 28 minutes 53 seconds West, a distance of 444.61 feet to a copper-steel rod; thence along the same, South 85 degrees 18 minutes 35 seconds West a distance of 89.14 feet to an iron pin; thence along the same, South 74 degrees 46 minutes 20 seconds West a distance of 707.24 feet to a Limestone; thence along the same, South 73 degrees 10 minutes 06 seconds West a distance of 996.75 feet to a railroad spike, in the centerline of North Union Street (T-390), the point of beginning. Being a tract of land containing in area 177.999 acres more or less.

EXCEPTING therefrom, any covenants, conditions and restrictions of record; private, public and utility easements; and road and highway easements of record.

## CERTIFICATION OF SERVICE

I, Robert M. Mumma II, do hereby certify that I have served a copy of the foregoing DEBTOR'S RESPONSE TO MOTION OF DOUBLE M REAL ESTATE, LLC AND DOUBLE M DEVELOPMENT FOR RELIEF FROM THE AUTOMATIC STAY upon the following persons by United States Mail, first class, postage prepaid, at Harrisburg, Dauphin County, Pennsylvania, addressed to:

| | |
|---|---|
| STEPHEN J. DZURANIN, ESQUIRE<br>WIX, WENGER & WEIDNER<br>508 NORTH SECOND STREET<br>PO BOX 845<br>HARRISBURG, PA 17108-0845 | COUNSEL FOR MOVANT |

MANN REALTY ASSOCIATES, INC.

Robert M. Mumma III, President

DATED: Feb 10, 2017